## THE JANE GREY.

(District Court, D. Washington, N. D. January 17, 1900.)

1. SHIPPING—CARRIERS OF PASSENGERS—ESTOPPEL TO DENY RESPONSIBILITY AS OWNER.

A large mercantile corporation, one of whose stockholders and directors was the owner of a vessel, advertised through the newspapers and by means of signs placed on the vessel while in port that she was operated by the corporation, and would be dispatched by it on a voyage for the carriage of freight and passengers, the standing of the corporation presumably influencing passengers and shippers to some extent to patronize the vessel. On the voyage the vessel was lost, together with her cargo and many of her passengers. Held, that the corporation could not escape liability as an owner by showing that it in fact had no interest in the vessel nor her voyage.

2. SAME—LIABILITY OF OWNERS—FAULT OF VESSEL OR MASTER AND CREW.

Evidence considered, and held to show that the loss of a schooner, which foundered without due stress of weather, was due either to some fault in the vessel or on the part of her master and crew, which gave a legal claim for compensation against the owners to the surviving passengers and the representatives of those who were lost.

3. SAME—LIMITATION OF LIABILITY.

The failure of a sailing vessel to carry a sufficient supply of life preservers for her passengers, which is not required by act of congress nor by custom, cannot be charged as a fault against the owners, who intrusted her equipment entirely to a competent master, which will deprive such owners of the right to the limitation of liability provided by Rev. St. § 4283.

4. SAME—LOSS OF CARGO AND PASSENGERS' EFFECTS—EXEMPTION FROM LIABILITY UNDER HARTER ACT.

Where, before entering upon a voyage, a ship was surveyed by three competent and experienced men, employed respectively by the owners and

the insurers, and was by all pronounced staunch and seaworthy, and the owners employed men of skill and experience to overhaul the vessel and make all needed repairs, to supply and equip her for the voyage, and stow the cargo, and also an experienced master and crew, and no neglect or mistake in such particulars is shown, the owners must be held to have exercised due diligence to make the vessel seaworthy, and properly manned, equipped, and supplied, and to be relieved from all liability on account of loss of property, by section 3 of the Harter act.

5. SAME—CONSTRUCTION OF STATUTE—PENDING FREIGHT.
The interest of the owners in a "vessel and her freight then pending," within the meaning of Rev. St. § 4283, limiting their liability in certain cases, is intended to include their entire interest or investment in the adventure, and they are not entitled to make any deduction from the gross amount of freight and passage money pending on account of any expenses incurred for the voyage.

In Admiralty. This was a proceeding by the owners of the schooner Jane Grey for limitation of their liability growing out of the sinking of the vessel during a voyage. On final rehearing.

Stratton & Powell and White, Munday & Fulton, for petitioners.
J. M. Wiestling, Bausman, Kelleher & Emery, and John A. Haight, for cross libelants.

HANFORD, District Judge. Mr. John G. Pacey, as owner of the American schooner Jane Grey, which foundered at sea on the morning of May 22, 1898, and certain of his business associates, commenced this proceeding in this court, pursuant to the provisions of the statutes limiting the liability of owners of vessels for damages resulting from marine disasters. In their petition they aver that the Jane Grey filled with water and sank in the Pacific Ocean, and became a total loss, and that 34 of the passengers and 3 of the crew on board were drowned, and that "said accident happened, and the loss, damage, injury, and destruction above set forth were occasioned, done, and incurred without fault or privity or knowledge of your petitioners, or any of them, and was due solely to the perils of the sea." The petition also avers as the reason for joining other persons with the owner of the schooner in the petition that a number of actions to recover damages have been commenced, in which all the petitioners are charged as being joint owners of the Jane Grey, and jointly liable for damages alleged to have been sustained. The object of the petitioners in this proceeding is to obtain an injunction to prevent the prosecution of the several damage suits which have been commenced as aforesaid, and to have a decree declaring the petitioners to be entirely exempt from all liability, or, if the court shall determine that any legal liability exists to render compensation for losses or injuries on account of said disaster, that the petitioners, and each of them, after paying into court for the benefit of persons entitled to such compensation the amount of pending freight, may be exempted from further liability. Pursuant to the rules governing such proceedings, the court appointed an appraiser, who, after receiving evidence, ascertained and reported to the court that the amount of pending freight for the voyage was the sum of $4,392.18, that being the gross amount of freight and passage money for the voyage; and in his report to the court

said appraiser shows that he refused to make any deductions for expenditures in supplying and equipping the vessel for the voyage, and for wages paid to the captain and crew. The petitioners filed exceptions to said report, and, without waiving the same, filed a stipulation by which they became bound to pay said amount into court whenever the court shall so order. Six of the surviving passengers, and the widows and heirs of several whose lives were lost, have appeared in opposition to the petition, and have filed cross libels, in which they charge that the disaster and the consequent losses of life and property and personal injuries were occasioned by the wrongful conduct of the petitioners in knowingly sending the Jane Grey on said voyage when she was rotten, weak, and unseaworthy, and without boats or equipment necessary for the safety of her passengers, and very much overloaded; and each of said cross libelants prays for a decree against the petitioners jointly for full damages and costs. The court has heretofore overruled exceptions to the several cross libels in which damages are demanded for lives lost (see 95 Fed. 693), and since said ruling a large amount of testimony has been taken relative to the facts of the disaster, and the condition and appearance of the vessel, the nature and quantity of her cargo, and the manner in which it was stowed, and the case has been argued and submitted upon the questions raised by the pleadings, which are:

First. Whether the petitioners, other than Mr. Pacey, are liable as owners.

Second. Whether the loss of the vessel and the resulting injury happened in consequence of any fault in the vessel, or neglect of duty on the part of her owners, master, or crew.

Third. Whether the losses and injuries were occasioned or incurred without the privity or knowledge of the owner or owners, within the meaning of the terms used in section 4283, Rev. St. U. S., which reads as follows:

"Sec. 4283. The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, lost, damage, or forfeiture, done, occasioned, or incurred without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

Fourth. Whether the owner or owners exercised due diligence, before the Jane Grey started on her voyage, to make said vessel in all respects seaworthy, and properly manned, equipped, and supplied within the meaning of the terms used in the third section of the act of congress commonly called the "Harter Act" (2 Supp. Rev. St. U. S. p. 81), which reads as follows:

"Sec. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God,

or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

Fifth. If there is any legal liability, and if the owner or owners are entitled to the benefit of the limitations prescribed by the statutes, whether any deductions shall be made from the gross amount of freight and passage money for the voyage on account of the expenses of the voyage.

1. It is certainly established by a fair preponderance of the evidence that Mr. Pacey was, in law and in fact, the sole owner of the Jane Grey. Mr. Pacey was, however, a stockholder, trustee, and one of the managing officers of a mercantile corporation, and with his knowledge and consent, and the knowledge and consent of the other trustees and managing officers, said corporation advertised extensively through the daily newspapers and other mediums, and by a sign conspicuously displayed on the rigging of the Jane Grey while she was at the dock receiving her cargo, at and before the time of the sale of passage tickets to the passengers who went upon her, that said corporation was operating said vessel, and would dispatch her as a carrier of freight and passengers from Seattle to Kotzebue Sound. The evidence is direct and positive that the corporation did not, in fact, control the operation of the vessel, and was not interested in the venture, and that the representations made to the public by means of said advertisements were merely intended to attract public attention to the corporation as a dealer handling large stocks of general merchandise. The advertisements certainly were calculated to influence people to take passage on the Jane Grey in preference to other vessels bound for Kotzebue Sound, and it may be presumed that all of her passengers were to some extent influenced, as they would naturally be, upon being solicited by or on behalf of a large and flourishing business house; and it is, therefore, too late, after sending the vessel upon the very voyage which she was advertised to make, with a large company of passengers, who were thus influenced to go upon her, for the advertiser to change to a more favorable position with respect to its liability by offering true information at variance with representations previously made. I hold, therefore, that the corporation is estopped, and it cannot be permitted to dispute liability as an owner of the vessel for the voyage. There is no evidence upon which to base a finding that the other petitioners were, as individuals, interested in the venture, nor that any of the passengers were induced to go on the Jane Grey by any representations from which it might have been inferred that said petitioners were individually responsible in any way for the operation of the vessel. Therefore Mr. MacDougall and Mr. Southwick are entitled to have a decree exempting them from personal liability.

2. The cause of the loss of the Jane Grey cannot be determined with certainty. Probably the truth as to the cause of the disaster will never be known until the great ocean shall reveal the secrets buried in its depths. The vessel was comparatively new, and yet

she had made long voyages from the Atlantic to the Pacific Ocean, had crossed the Pacific, and had navigated the Arctic Seas in the business of whaling, for which she was built; so that by actual service she had been proved to be staunch, strong, and seaworthy. In the month of March, 1898, she was docked at San Francisco, and was newly caulked and painted, and at the same time she was inspected by two competent marine surveyors representing different insurance companies, who found her to be sound, and in good condition, and each made a report upon her to that effect. Upon her arrival at Seattle she was examined by a shipbuilder employed for that purpose by Mr. Pacey, who relied upon his report that she was sound, and in good condition, in completing his purchase of her. Just previous to being dispatched on her last voyage, she was overhauled generally, and equipped for the voyage, under the direction of a captain who was reputed to be a man of experience and good judgment, and who, according to the undisputed testimony, was allowed to have everything done to fit her for her contemplated voyage that he deemed to be necessary. According to the undisputed evidence, the cargo, which consisted of coal, flour, lumber, miners' implements, provisions, and miners' outfits, and some machinery, was carefully stowed under the captain's directions, by the mate and crew, who were competent for that work. Besides her freight, there was placed in the bottom of her hold 40 to 50 tons of rock ballast, which was planked over and made secure. The cargo placed on top of this flooring was sufficient to fill the space to her deck beams. There were also in the hold two large water tanks, resting upon the bottom, which contained 1,200 gallons of water. The vessel had capacity to carry 160 tons of freight, but on this voyage her whole burden, including passengers, crew, stores, water, cargo, ballast, and a new house, built for the accommodation of passengers, on the forward part of her main deck, did not exceed 140 tons, less than 20 tons of which was above her deck. She was also inspected by two experienced mariners at the instance of passengers who must have been encouraged by the reports made to them, for they trusted their lives and property to her seaworthiness by going upon the voyage in her.

The Jane Grey was designed for a whaler. Her model was medium sharp below the water line, but she was tender sided; that is, intended to roll easily, to facilitate the work of hoisting on board whale blubber from the sea. Her natural crankiness was increased by her deck load and the new house, but she was not top-heavy. The deck load consisted of two steam launches placed upon her quarter-deck, the weight of which, with the machinery therein, amounted in the aggregate to a little less than 1½ tons; 18 barrels of water, weighing a little more than 3½ tons; 1 ton of coal, and a boiler weighing about ½ ton; and 1 crate of cabbage weighing 100 pounds,—all of which were placed on the main deck a midship, or nearly so; one ship's boat hung on the davits at the stern, and on top of the forward house one ship's boat, a dory, and lumber and materials for four other boats, weighing in the aggregate less than half a ton; two cases coal oil, weighing about 100 pounds;

600 pounds of fresh beef; a circular saw and odd pieces of machinery and gas pipe,—all of which was only of trifling consequence as regards its effect either as to weight or bulk. The bulwarks were built up about $3\frac{1}{2}$ feet high above the deck, and the forward cabin was extended about $3\frac{1}{2}$ feet above the top of the bulwarks. The after cabin was the usual construction; that is to say, the floor was below the level of the main deck, and the roof formed a poop deck. Considering all the testimony as to the construction of the vessel and the manner in which she was ballasted and stowed, it is clear that, while she would roll easily, she ought not to have capsized. If she was listed over by pressure of the wind upon her sails, or by the force of the sea striking her, she ought to have righted up again easily, unless she was held down by the wind upon her sails, or her cargo shifted. If her cargo or ballast moved, the captain, mate, and others of the survivors whose testimony has been taken, failed to hear any sound or feel any jar indicating such an occurrence. The evidence is equally convincing that the Jane Grey was staunch and sound, her pump was in good working order, and was tried regularly every hour during the night before she foundered, without showing any indication that she was leaking. In an open sea, without any injury to her hull, a vessel in her condition ought not to have suddenly opened her seams, and become water-logged; and, if she did, she would naturally sink straight down, instead of laying over on her side. As to what did actually happen, the testimony shows that, after being towed from Seattle to Port Townsend, the Jane Grey sailed down the Straits of Fuca and out to sea, passing Cape Flattery on the morning of Saturday, May 21st, with a stiff sailing breeze, or moderate gale, drawing out of the straits, and encountered a heavy sea rolling in. With the wind and sea coming from opposite directions she labored heavily, but proved her seaworthiness by riding the waves successfully. The waves did not break over her, as only a dead swell was rolling, but a great deal of water came upon her deck through the hawse pipes, scuppers, and seams of her bulwarks, flooding the passenger cabin situated on the forward part of her main deck. Finding that the lower bunks in that cabin were flooded, the captain put the vessel on a course before the wind, so that she would come up level, and then stopped her hawse pipes, but, as the water still came in through the bulwarks, he attempted to beat his way back to Neah Bay, intending to wait for better weather, and caulk the bulwarks; but the vessel was unable to make headway towards Neah Bay because the wind was adverse, and, on account of crankiness, the vessel would not lay up when closehauled, so as to sail to windward. After several hours of fruitless efforts, the attempt to run back to Neah Bay was abandoned, and the vessel was again turned upon her course, steering west-southwest, and she continued on that course until 8 o'clock in the evening. At that time, as the vessel was laboring heavily, and most of the passengers were sick, the captain decided to heave to. All sails were taken in except her foresail, and she was headed to the wind. Leaving the vessel in that position, the captain went to bed at 9 o'clock, and did not come

on deck again until a few minutes before the vessel went down, about 2 o'clock the next morning. The mate was on watch from 8 o'clock until 12 o'clock, when he also retired, leaving only two seamen on deck. The conditions as to the wind and sea and the action of the vessel continued about the same until about 1:30 o'clock on the morning of the 22d, at which time, according to the testimony of the seaman Carlson, the only man on deck who has survived to tell of the occurrence, the vessel was heading south-southwest, when a squall came from the southeast, which caused her to list over on her starboard side. Carlson strapped the wheel, to keep it steady, and went forward, and lowered the peak of the foresail, but, instead of righting herself, the vessel lay dead in the water. According to the mate's testimony, he was awakened about this time by the cook, who informed him that water was coming in the door of the after cabin; and the first thing he did was to get up and shut the door. Then he seemed to realize that something was wrong, and he went on deck, and ordered one of the seamen to "hard up his helm," and then he called the captain. According to the captain's testimony, when he came on deck the vessel was laying over with her lee rail under water. He at once called all hands on deck, and ordered the foresail lowered, and it was lowered very quickly. He next ordered the men to set the forestay sail, and that was done. Still the vessel did not lift, nor respond to her helm, but gradually settled in the water. The captain then ordered the men to set the jib, and in attempting to obey this order the halyard parted. By this time the captain realized that the vessel was lost, and he ordered the boats cut loose, and made what efforts he could to save the lives of the people on board. The vessel never straightened up, but continued listing more and more to starboard, settling gradually, so that, when last observed by the witnesses, her topmasts were bobbing up and down in the water. She went out of sight in about 10 minutes after the captain gave the order to cut the boats loose. Twenty-seven of those on board saved themselves by getting into one of the steam launches, which was not provided with oars, rowlocks, or other means of propulsion; but by means of paddles which they made out of pieces of lumber which they picked up, and an improvised sail, made out of a piece of canvass found in the boat, they finally made their way to the shore of Vancouver Island.

The argument made on behalf of the petitioners is based upon the theory that the heavy cross seas which the Jane Grey encountered strained her timbers so as to cause a large opening to be made in her planking below deck, so that she filled with water rapidly, and that her loss is due to that cause. This theory is inconsistent with the testimony showing that the vessel was staunch, sound, and newly-caulked; and also inconsistent with the fact that she did not go straight down, but laid over on her side, which a vessel loaded and ballasted as she was would not have done if she had become waterlogged through an opening below her deck. The theory of the cross libelants is that the vessel was capsized by reason of having insufficient ballast, and being loaded on deck so as to make

her top-heavy. Against this theory we have convincing evidence that the vessel was well ballasted, she was not overloaded on deck, and she successfully buffeted with wind and sea for nearly 24 hours without being capsized; and in the end she did not capsize, nor behave like a top-heavy vessel, but merely listed over when the squall struck her, and then gradually settled down as a vessel would if she were knocked over and pressed down until she filled with water through the openings in the deck. The theory which seems to me to be best supported by the evidence is that the Jane Grey was lost because of negligence and bad seamanship of her captain and crew. When she was hove to, instead of taking in her large foresail, and setting her forestay sail and her jib, so as to hold her steadily with her head to the wind, all the head sails and the mainsail were taken in, and she was left drifting without steerage way, and with only one sail,—the foresail. If the testimony of the seaman Carlson is accepted as true,—and there is nothing against it, except that in other respects his testimony is not accurate,—the vessel was struck by a squall from the southeast when she was heading south-southwest with her foresail closehauled. With a vessel in that position, the wind coming abeam would naturally do what was done to the Jane Grey; that is, lay her over on her starboard side, and hold her down. The wind would not be so directly abeam as to give her any headway; on the contrary, it would set her back, so that her helm would not be of any assistance in righting her. It certainly was not vigilance on the part of the captain for him to go to bed at 9 o'clock the first night at sea, in heavy weather, trusting the vessel so entirely to the care of his mate and seamen; and he was unreasonably slow in getting out of the cabin after the squall struck. It is probable that before his first order to lower the foresail could be executed the vessel was down so that the sea rushed into her after-cabin door, and that the weight of the water flowing in held her down after she had been relieved from the pressure of the wind on her foresail. This supposition is supported by the testimony of Mr. Livingood, a passenger who had a bunk in the after cabin, who testifies that, before he came out of the cabin he was standing in water up above his knees considerably, and that the water was rushing in. In giving his testimony on cross-examination, the captain at first stated that the vessel filled through her cabin, but immediately afterwards, in answer to a leading question, he stated that it is now his opinion that she filled from below, and that he always thought so. It is not unlikely that this captain would assent to any theory which would relieve him from responsibility for losing the vessel by bad seamanship. According to all the testimony, there was only a moderate gale of wind, and, although the waves were rolling high, they were not breaking, and the sea did not at any time break over the vessel; so her loss cannot be attributed to extreme severity of a storm, which a vessel in seaworthy condition, and handled by her officers and crew with ordinary good seamanship, should not have overcome. Therefore, whether we adopt the theory that the vessel was lost by reason of a defect in the planking or timbers, which caused an opening, and let the sea in below

her deck, or the theory that she rolled over because she did not have sufficient ballast, and was loaded on deck so as to make her top-heavy, or, the most plausible one of all,—that is, that the disaster is due to a want of vigilance, or blundering, on the part of the captain and crew,—we are led to the same conclusion, and that is that there was some fault in the vessel, or on the part of those in charge of her; and by reason of that fault, whatever it may be, the injured passengers who have survived, and the wives and children of those who are lost, have a legal claim for compensation.

3. The evidence is direct and positive to the effect that neither Mr. Pacey, nor any of the managing officers of the MacDougall & Southwick Company, knew, or had reason to suspect, that the vessel was not as she appeared to be; that is, sound and seaworthy throughout, properly ballasted, stowed, equipped, and manned for the voyage. They do not know what caused the disaster, and they cannot be blamed for not knowing, because, after studying the voluminous testimony, and giving due heed to the arguments of counsel, and considering all the facts brought to my attention, I do not know what caused the disaster, and the witnesses do not pretend to know. In the argument the owners are censured for neglecting to provide life-boats, rafts, and life-preservers. I find from the evidence that it would have been nearly, if not quite, impossible for the Jane Grey to have carried a better supply of boats. It is true that the two launches were owned by passengers, but the objection to their being considered part of the equipment of the vessel for the voyage is a mere quibble. As a matter of fact, the survivors who were actually rescued by the use of one of those steam launches did not, at the time of extreme peril, stop to inquire who owned the boat, nor refuse to seek safety in her because she had not been provided by the owners of the Jane Grey specifically for use as a lifeboat. The seaman Carlson testifies that the ship's boats were in such a bad condition as to be unfit for use, but he is contradicted in this regard by other witnesses, and his testimony in other respects is certainly inaccurate. For instance, he fixes the day of departure of the Jane Grey from Seattle on Tuesday, and says that she sailed out of the Straits the following Saturday night, and that she went down on Monday morning; while the truth is, she left Seattle Thursday, sailed out of the Straits Saturday morning, and went down on Sunday morning. And again, he testifies that the captain was on deck one hour before the vessel began to sink, while it is proved by all the other testimony bearing on the point, including the captain's own admissions, that he went to bed at 9 o'clock and did not again come out of the cabin until the vessel was in a helpless condition. I therefore reject the testimony of Mr. Carlson as to the condition of the boats. If there was any neglect to furnish the boats with oars and rowlocks, that is a mere matter of detail in the manner of the use of the equipments which were furnished by the owners. The testimony shows that there were plenty of oars on board the schooner, and rowlocks; and, if they were not placed convenient for use in an emergency, the captain and crew alone are to blame for such neglect.

With the boards and materials for boat construction which were loose on top of the forward house, and which, afloat, were just as useful as life rafts, any additional floating structures would have been a useless incumbrance. An act of congress requires all steam vessels employed in carrying passengers to keep on board and accessible a supply of life-preservers. Just why this should be required of steam vessels and not be applicable to sailing vessels engaged in carrying passengers I do not know, but congress has discriminated, and has failed to enact a law requiring sailing vessels to carry life-preservers. The testimony shows also that it is not customary for sailing vessels to carry life-preservers. In view of these facts, it would be unfair, and contrary to the spirit of the law, to deprive the owners of the benefit of the statute for failure to supply the vessel with life-preservers. Knowledge of a defect in the equipment of the vessel in this respect cannot be imputed to them, when neither the statute nor custom requires sailing vessels to carry life-preservers as a part of the equipment necessary to fit them for service as carriers of passengers. I consider that, for the safety of her passengers, the vessel ought to have carried a sufficient number of life-preservers, and her captain should have made a requisition for them, although there is no statutory requirement; but, as the owners depended upon the captain to see that the equipment of the vessel for the voyage was complete in every particular, they are exempt from personal liability for his neglect in this regard, the same as they are exempt from liability for his conduct in permitting the vessel to go adrift on a stormy night, with only two sailors on watch. It is my conclusion that the loss of the vessel occurred without the privity or knowledge of her owner, or of the managing officers of said corporation; and, having stipulated to pay the amount of pending freight, according to the report of the appraiser appointed by this court, they are entitled to the benefit of section 4283, Rev. St., which exempts them from liability for any greater amount.

4. Having employed men of experience and skill in such work to overhaul the vessel, make what repairs were found to be needed, and supply and equip her for the voyage and stow the cargo, and there being no evidence of neglect or mistake in these particulars on the part of the owners or their employés, I must find that they did exercise due diligence to make the vessel seaworthy, and properly manned, equipped, and supplied. Therefore there is no liability for loss of property. The Harter act exempts the vessel, her owners, agents, and charterers from all liability.

5. All that is available for distribution to compensate the sufferers by loss of the Jane Grey is the amount of pending freight, the vessel herself being a total loss. The phrase "freight then pending," as used in the statute, has been construed to include freight prepaid for the carriage of merchandise, and passage money, and it has been decided by the highest authority that the phrase should not be taken in a narrow sense as meaning only the freight to be earned by a successful conclusion of the voyage. The Main v. Williams, 152 U. S. 122–133, 14 Sup. Ct. 488, 38 L. Ed. 384. The

petitioners, however, by filing exceptions to the report of the appraisers appointed to ascertain the amount of the value of the vessel and her freight then pending, have raised a question as to their right to subtract from the freight then pending the amount of their expenditures in sending the vessel on her voyage. Their bill of items includes wages advanced to the captain and crew, a bill for towing the vessel from Seattle to Port Townsend, money paid to stevedores for stowing the cargo, and the price of stores and dishes supplied for the voyage. Also money which they have disbursed since the loss of the vessel, including the fees of a notary public for the protest respecting the loss of the ship, the cost of telegrams conveying information of the loss, and various sums which they paid for the comfort or benefit of the survivors. It seems to me that they might with equal propriety subtract all their other expenses connected with the purchase and fitting out of the vessel, and commissions paid to soliciting agents for inducing passengers to purchase tickets. If they can subtract the cost of supplies and dishes furnished for the voyage, they might as well include the value of the sails, rigging, anchors, cable, and hull of the ship. In the case above cited the supreme court of the United States has declared that the real object of the act limiting the liability of shipowners "was to limit the liability of vessel owners to their interest in the adventure. Hence, in assessing the value of the ship, the custom has been to include all that belongs to the ship, and may be presumed to be the property of the owner; not merely the hull, together with the boats, tackle, apparel, and furniture, but all the appurtenances, comprising whatever is on board for the object of the voyage, belonging to the owners, whether such object be warfare, the conveyance of passengers, goods, or the fisheries." The owner is required to suffer the entire loss of all that he has invested in the ship and on account of the voyage, and all that he has received for freight and passage money, and all the ship would have earned by completing the voyage; and upon condition of his yielding whatever may be saved out of the wreck and freight pending for the benefit of the shippers and passengers he is exempted from personal liability to them for "any loss, damage, or injury by collision, or for any act, matter, or thing lost, damage or forfeiture done, occasioned, or incurred, without the privity or knowledge of such owner or owners." Except for the statute, the liability of the owner to passengers and shippers for damages in consequence of the negligence of the captain or misbehavior of the crew would be limited only by the amount of loss and by his ability to respond. As a basis for making a pro rata distribution of the fund, I fix the amount of damages awarded to each of the cross libelants who are survivors of the wreck at the sum of $1,000, and to the cross libelants who are suing as widows and heirs of passengers who were lost with the vessel the sum of $5,000 for each life so lost. The fund will be distributed pro rata, and on this basis will pay 12.2 per cent. of the damages awarded. The usual taxable costs will be awarded to the cross libelants.