## PILLSBURY FLOUR MILLS CO. v. BECKER S. S. CO.

District Court, W. D. New York.
Jan. 14, 1931.

Brown, Ely & Richards, of Buffalo, N. Y. (Laurence E. Coffey, of Buffalo, N. Y., of counsel), for libelant.

Holding, Duncan & Leckie, of Cleveland, Ohio (T. C. Robinson and Lee C. Hinslea, both of Cleveland, Ohio, of counsel), for respondent.

HAZEL, District Judge.

On October 7, 1927, at Duluth-Superior, libelant, Pillsbury Flour Mills Company, delivered aboard the steamer Francis L. Robbins, respondent owner, in good order and condition, 200,000 bushels of wheat for shipment to the port of Buffalo, delivered pursuant to bill of lading in like condition, and storage until April 1, 1928, if desired. The freight charges, including storage, were paid. The hatches were opened on January 14, 1928, at Buffalo, and the cargo was discovered to be in a damaged condition. It was wet, moist, and heated, mostly on the starboard side of the steamer. Respondent claims that the sea water entering the ship's cargo in course of downward transportation was due to perilous weather which was the proximate cause of the damage, and, under the Harter Act and terms of the bill of lading, the carrier was excepted from liability.

Libelant's contention is that the steamship was unseaworthy and unfit for carrying the cargo in question at the inception of the voyage, and, moreover, that the seas encountered in Lake Erie on her downward trip were not unusual in the month of October or the fall of the year when gales and seas are not infrequently encountered on the Great Lakes.

The steamer Robbins was built in 1905, of 4,222 gross registered tons, 400 feet long, 50 feet beam, 28 feet molded depth. She has 3 compartments for carrying cargo and 20 hatches. The evidence shows that after repairing three plates on her starboard side in the spring of 1927, which had been damaged in a collision, she was moored from April 12,

1927, to ensuing September 28, 1927, with a cargo of coal at the breakwater in Buffalo harbor, and on the last-mentioned day, sailed for Milwaukee, where her coal cargo was unloaded. In ballast she went to Duluth without any leaks having been discovered, and, after inspection by her officers at Superior, 2 rivets were found loose and leaking on her starboard side, which were caulked and hose tested in the customary manner. She was pronounced fit for grain carriage prior to her departure by the vessel supervisor of the state, and loaded with the grain cargo in question. Her hatches are shown to have been properly battened down. On her downward voyage she encountered some wind on Lake Superior, and on arriving at Lake Erie, while passing Southeast Shoal at 1:58 a. m., a fresh south wind overtook her, which, below the shoal, increased to 30 miles an hour. The seas rolled over her decks and the velocity of the wind from the south increased from 4:30 to 5:30 a. m., raising the seas 25 to 30 feet and continuing to roll over her decks. She pitched and tossed causing her to strain and twist continuously for more than four hours. The velocity of the wind, as testified by her mate, increased to 60 miles an hour; while her master estimated 65 to 75 miles an hour. She hauled S. E. under check for the lee of the south shore at 9:35 a. m. The wind abated when the steamer arrived off Ashtabula, from whence there was good weather to Buffalo, where she arrived at 3:50 a. m., October 15, 1927. Her master filed a protest and notified libelant of the ship's downward travail. In January, following, her hatches were opened, and the grain, mostly in No. 10 hatch on her starboard side, was found moist and heated, as already mentioned, and pyramids of grain were found on the starboard side of the hatches; their points being underneath the spar deck between the ends of the hatches and the starboard side of the ship. Some water, the proofs show, had come under the battens between the tarpaulin and combings, but none by way of the hatches. Sweeney, the underwriters' surveyor, testified that the water damaged the cargo from straining and leaking butts and seams. Afterwards, 12,000 rivets were replaced in seams and butts of H, J, and K strakes on her starboard side, and 8,000 rivets on her port side, 500 rivets in the deck, and 25,000 lineal feet of caulking in hull and deck, together with repairs to combings, deck stringers, and butts were deemed necessary. The ship had been tested and examined in the spring of 1927, five months before the mishap by the superintend-

ent of the Buffalo Marine Construction Company, the surveyors for the hull underwriters, and by United States Inspector Boggan, and she was certified seaworthy. McGinley, of the construction company, testified that he examined the Robbins after she was repaired at this time and found her in proper seaworthy condition for carrying grain; that he did not apply a hammer test to the rivets, but explained that, since she had just prior to the examination unloaded a grain cargo, he could tell whether the rivets were loose, for, if they were impaired, the water, he said, would have come through and either held portions of the grain at such points or streaked the side of the hull white on her gray-painted background. Daniels, a marine surveyor, surveyed the ship in the spring of 1927, for the hull underwriters, and in fact directed her repairs, and he again surveyed her in the spring of 1928, after her arrival with the grain cargo in question; and he expressed the opinion, in answer to a hypothetical question, that her condition at such time and the damage to the grain were due to stress of weather. Boggan also testified that the ship was tight, staunch, and seaworthy, and further that the loose rivets, discovered after her downward trip, were not loose or impaired the previous spring when she was examined.

Libelant contends that a windstorm blowing 65 miles to 75 miles an hour is not extraordinary or unusual on the Great Lakes in the fall of the year, and that such a storm should have been anticipated. It is not claimed, as I understand it, that the storm was of "catastrophic proportions" or "extraordinarily terrific"; but that the storm was unusually violent, and in fact started the butts and opened the seams of the steamship and entered the cargo, is clearly evidenced. In The Warren Adams, 74 F. 413, it was said by the Circuit Court of Appeals for this circuit: "'Perils of the sea' mean 'all marine casualties resulting from the violent action of the elements, as distinguished from their natural, silent influence upon the fabric of the vessel; casualties which may, and not consequences which must, occur.'" Proctor for libelant, in support of his contention, attaches importance to the decision in The Rappahannock, 184 F. 291, 294, wherein Judge Lacombe, writing for the Circuit Court of Appeals, after describing the character of the gale, said: "That the * * * wind and sea which were not unusual at that season of the year. Seaworthiness imports ability to meet such conditions." But I think the facts in that case were different from the facts here.

There the damage was attributable to a crack in the main feed pipe running through the cargo space between the boiler and engine. The pipe contained in the box had not been renewed for eleven years, and had not been thoroughly inspected for more than a year, and the learned judge therefore determined that the real cause of the damage did not eventuate from the dangers of navigation, but was due to the defective pipe which rendered the vessel unseaworthy.

In the instant case, as already pointed out, it is fairly established that the stress of the storm severely strained the ship, letting in the sea on the sides of the vessel and at other points, and that the ship was fit at the inception of the voyage. There are numerous adjudications that hold that admission of sea water under stress of weather is not unseaworthiness, especially when it appears that, as in this case, a careful inspection of the ship, visual and otherwise, was made by the agents of the underwriters and others before the voyage began. The Sandfield (C. C. A.) 92 F. 663. She need not be in perfect condition. Hamilton v. U. S. (C. C. A.) 268 F. 15. And "seaworthiness involves no more than a reasonable fitness for the purposes of the voyage." In re Gravel Products Corp. (C. C. A.) 24 F.(2d) 702, 703. Reasonable diligence, I find, was exercised in this particular. See The Jane Grey (D. C.) 99 F. 582, 583. Although the majority of the rivets were probably as old as the ship, inspection uncovered no impairment. Even without the hammer test, the condition of the rivets was discoverable, and, as testified by McGinley whose testimony is not contradicted, they were not loose when the voyage began. It is not customary to hammer the rivets of the entire ship, libelant's surveyor testified, aside from hose-testing it, to ascertain whether rivets were weakened or loose. Indeed, the steamer had 400,000 rivets and to hammer test them all would have been impracticable and unnecessary, especially as another satisfactory test was available, and reasonable diligence exercised in making it.

Inasmuch as the respondent was bailee to transport the grain as a private carrier for hire, the full capacity of the ship having been chartered, the burden rested upon libelant to show that the vessel was unseaworthy prior to the shipment or that there was negligent inspection. The C. R. Sheffer (C. C. A.) 249 F. 600; The Oakley C. Curtis (C. C. A.) 4 F.(2d) 979; The Nordhvalen (D. C.) 6 F. (2d) 883. This has not been shown.

The burden of proof that the sea water damaged the cargo because of perils of the sea rested upon respondent, and in my opinion this burden has been satisfied. The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Charlton Hall (D. C.) 285 F. 640. And, since I have concluded, after consideration of the record in its entirety, that the ship was seaworthy and the damage caused by dangers of the sea, and that respondent exercised due diligence in properly outfitting the steamer for grain transportation, I hold that she was exempt from liability under the bill of lading and the provisions of the Harter Act (46 USCA §§ 190–195). Findings of facts and conclusions of law under new Admiralty Rule 46½ (28 USCA § 723), effective October 1, 1930, may be submitted, if deemed necessary.

Decree for respondent, with costs.