**GENERAL HIDE & SKIN CORPORATION v. UNITED STATES.**

District Court, E. D. New York.    January 19, 1928.

No. 7713.

1. **Shipping** ⊕=132(5½)—**Contemplated voyage at time of shipment can be shown by extrinsic evidence.**

Contemplated voyage at time of shipment can be shown by extrinsic evidence, and carrier's advertisements may be shown to determine contemplated voyage.

2. **Shipping** ⊕=125—**Ship, having exercised option and commenced voyage, was bound to proceed on such course.**

Ship, having exercised option of proceeding by one of two routes and commenced her voyage, was bound to proceed on the course she had selected.

3. **Shipping** ⊕=125—**Owner of ship, breaking warranty not to deviate, became insurer of cargo.**

Owner of ship, breaking its warranty not to deviate from route, became insurer of cargo, and liable for all damages occasioned to consignee.

4. **Shipping** ⊕=125—**Shipper is bound by custom as to usual route.**

Shipper is bound by custom relative to usual route between points, whether it has knowledge thereof or not.

5. **Shipping** ⊕=125—**Changing course from via Panama Canal to via Suez Canal constituted "deviation."**

Change of course from route via Panama Canal to via Suez Canal, after commencement of voyage via former route, necessitating traveling greater number of miles and consuming longer period of time, *held* to constitute "deviation."

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Deviation (in Law of Shipping).]

6. **Shipping** ⊕=108—**Shipper's letter, admitting right to change course, held immaterial as to right to recover damages for deviation.**

Shipper's letter to, owner's agent, admitting right under bill of lading to change course, *held* immaterial as to right to damages because of deviation, as simply showing that writer of letter put a wrong legal construction on obligation of ship.

7. **Shipping** ⊕=131—**Damages for deviation is difference between value of shipment at time of arrival and value after arriving on ordinary voyage.**

Measure of damages for unauthorized deviation from route constitutes difference between. actual value of shipment when it arrived, and what it would have been worth if it arrived on an ordinary voyage as routed.

In Admiralty.  Suit by the General Hide and Skin Corporation against the United States.  Decree for libelant.

Bigham, Englar & Jones, of New York City (Oscar R. Houston, of New York City, of counsel), for libelant.

William A. De Groot, U. S. Atty., of Brooklyn, N. Y., and Harold F. Birnbaum, Sp. Asst. U. S. Atty., of New York City.

CAMPBELL, District Judge.  This is a cargo damage suit.  All questions of physical damage to/and/or shortage of cargo have been disposed of by agreement between the parties, and claims therefor are withdrawn from the libel, leaving as the issue to be tried the right of the libelant to recover for alleged decline in market value of the shipment, and the amount thereof.

The skins in question were shipped by China Hide & Produce Company, of New York, ·Inc., at Tientsin, Taku Bar, on the steamship Archer, unto order of Irving Bank-Columbia Trust Co., New York, notify General Hide & Skin Corporation, and bills of lading were issued therefor, dated October 5, 1923, signed by Barber Steamship Lines, the United States Shipping Board Emergency Fleet Corporation, Admiral Oriental Line, managing agent, and the American Express Company, Inc., as agent, by T. J. Worthman, agent.

No particular route is noted in the bills of lading, which contain the usual provision,

"to be carried upon said vessel or any other vessel operated by or on account of the United States Shipping Board Emergency Fleet Corporation or the United States Shipping Board, with leave to sail with or without pilots, to tranship to any other vessel operated, employed or used by said corporation, or said board, or for its account, to lighter from vessel to vessel and from vessel to shore, to tranship either by rail, lighter or otherwise, to transfer to and from hulk, and to touch at any port or ports, in any rotation or order in, or out of, the customary route, and to call at any port or ports more than once, unto the port of New York (or so near thereto as vessel may safely get), and there deliver in like apparent good order and 'condition, at the vessel's tackles."

There were two routes which the steamship Archer could take, one by way of the Panama Canal, the other by way of the Suez Canal. Under the bill of lading, standing alone, the ship had the right to choose either route, and I would not charge the ship with having elected to follow either route, on the testimony of the then 'vice president of the shipper of his conversations with the manager of the agent of the ship.

[1] The voyage on which it was contemplated to carry at the time of shipment can be shown by extrinsic evidence, and the carrier's advertisements may be shown to determine the voyage contemplated. Propeller Niagara v. Cordes, 21 How. 7, at page 24, 16 L. Ed. 41. That the duly authorized agent of the ship at Tientsin advertised that the steamship Archer would sail the early part of October, from the port of Tientsin to the port of New York via the Panama Canal, and so informed the China Hide & Produce Company of New York, Inc., the shipper of said merchandise, is not only alleged in the libel, but is admitted in the twelfth article of the answer. The Panama route was shorter than the Suez route, even if no call was made at ports of the United Kingdom and Northern Europe.

In fact, the route via the Panama Canal was 11,453 miles. The course actually taken by the steamship Archer was 16,794 miles. Instead of arriving at New York before the holidays, about December 12, 1923, the steamship Archer did not arrive until about February 27, 1924. It clearly appears that the voyage advertised by the agent for the ship, and contemplated by shipper and the ship at the time the contract of affreightment was made, and on the commencement of the voyage, was via Panama.

The steamship Archer sailed from Taku

Bar, and not until 13 days thereafter, to wit, on October 25, 1923, did the shipper learn that the contemplated voyage was not to be pursued, when it received the letter from the manager of the agent of the ship at Tientsin, in which was quoted the part of the letter it had received from the Admiral Oriental Line, Inc., Shanghai, reading as follows:

"Please be advised that we have to-day received cable instructions from the Barber Steamship Lines, New York, diverting this ship to return home via Suez instead of Panama. Will you therefore kindly notify shippers of the diversion and the routing of this ship. There should be no difference in the arrival time of the ship at her home port."

[2] The ship having exercised her option and commenced her voyage, was bound to proceed upon the course she had selected. St. John Corp. v. Companhia Geral, etc., 263 U. S. 119, 44 S. Ct. 30, 68 L. Ed. 201. The change in the course of the ship from the shorter Panama route to the longer Suez route constituted deviation, and was deliberately done to save the ship from loss by reason of the fact that not sufficient cargo was offered at other ports for the agreed voyage.

[3] By breaking its warranty not to deviate, the respondent, as owner of the ship, became the insurer of the cargo and liable for all damages occasioned to the consignee. The respondent makes a point of the fact that libelant did nothing after receiving such notification of diversion, but has not pointed out what it contends the libelant was in duty bound to do.

The cargo was under the control of the respondent, on the ship, which had been on her voyage for 13 days, and there was nothing the shipper could do. As I understand the contention on behalf of respondent, it is that by silence the libelant ratified the diversion. This does not seem to me to be in accord with any decided cases, but, if it be so, then the steamship Archer was bound to go by the regular and usual route.

[4] Evidence was offered as to the usual route of other lines and of the Barber Steamship Lines between other points, and, if such custom be shown, libelant would be bound by it, whether it knew it or not. I do not believe the custom as to usual course from other ports than Tientsin is controlling, because much of the freight is sent from Tientsin to Shanghai and there transhipped, Shanghai appearing as the port of origin; whereas, when the shipment is direct from Tientsin,

the delay of transhipment is expected to be obviated and the voyage to be more direct. Three prior voyages of·Barber Line ships from Tientsin to New York were made, two by the Panama Canal and one by the Suez Canal, which was not via any Northern European ports.

[5] As I have before said, I believe the change of course from via Panama Canal to via Suez Canal constituted deviation; but, if it did not, then I can find no evidence which warrants the finding that the regular and usual route of the Barber Line from Tientsin to New York included Northern European ports; therefore the steamship· Archer deviated in calling at such Northern European ports.

I fail to see wherein the respondent is in any way relieved or aided by the letter of December 31, 1923, 25 days after the event, from the manager of the ship's agent at Tientsin to the shipper, informing it of the arrival and departure of the ship at and from Marseilles on December 6th, and its intention to call at the enumerated Northern European ports.

[6] The respondent also makes a point of the letter of the.shipper, dated January 3, 1924, to the agent of the ship at Tientsin, in˙ which it says:

"Although, of course, the Admiral Line is covered by the leeway given in the bill of lading, we think they should be morally responsible for the loss.which we are experiencing."

This does not seem to me to be of any moment, because, if I am right in my conclusions, it simply shows that the writer of the letter put a wrong legal construction on the obligation of the ship under the bills of lading. The ship deviated first in the change of route from via Panama Canal to via Suez Canal, and, having taken the latter route, it deviated by calling at Northern European ports.

[7] The measure of damages is the difference between the actual value of the shipment when it arrived, February 27, 1924, and what it would have been worth if it had arrived on an ordinary voyage as routed, namely, 60 days after the vessel left Tientsin, December 12, 1923. United States v. Middleton (C. C. A.) 3 F.(2d) 384; The Ontario, 1925 A. M. C. 1353; The Ablanset, 1925 A. M. C. 560; The Hoosac (C. C. A.) 20 F.(2d) 583.

A decree may be entered in favor of the libelant against the respondent, in accordance with this opinion, with costs and·the usual order of reference.