## PHILIPPINE REFINING CORPORATION et al. v. UNITED STATES.

### THE ARCHER.

District Court, E. D. New York. August 30, 1928.

No. 6289.

Bigham, Englar & Jones, of New York City (D. Roger Englar and James N. Senecal, both of New York City, of counsel), for libelants.

William A. DeGroot, U. S. Atty., of Brooklyn, N. Y. (William E. Collins and Harold F. Birnbaum, Sp. Asst. U. S. Attys., both of New York City, of counsel), for the United States.

CAMPBELL, District Judge. This action is brought against the United States of America, as owner of the steamship Archer, for shortage of and damage to two shipments of coconut oil, consisting respectively of 665 tons and 108 tons, carried in the deep tank of the steamship Archer, from the port of Manila to the port of New York.

The libelant Procter & Gamble Company was the owner of the shipment of 108 tons, having purchased the same from the libelant Philippine Refining Corporation, the shipper and consignee, and the bill of lading covering that shipment having been indorsed over to said Procter & Gamble Company.

The libelant American Linseed Company was the owner of the shipment of 665 tons, having purchased the same from the libelant Philippine Refining Corporation, the shipper and consignee, and the bill of lading covering that shipment having been indorsed over to said American Linseed Company.

The libelant Philippine Refining Corporation is interested, because of the fact that it was forced to pay, under protest, full freight on the bill of lading quantity although much less was delivered.

The steamship Archer was operated by the respondent as a common carrier, the Barber Lines being the agent. Respondent admits that some of the oil in the starboard section of the deep tank was contaminated with fuel oil, but denies that there is any proof of contamination of the oil in the port section of the deep tank; but I find that there was some contamination in both the starboard and port sections of the tank.

The loss and contamination resulted from the fact that there was a hole approximately one-half inch in diameter drilled through a plate near the forward end of the deep tank on the starboard side, which formed the top of the double bottom tank in which fuel oil was stored and the bottom of the deep tank in which the coconut oil was carried. The deep tank was separated into starboard and port sections by a fore and aft bulkhead, the manhole cover in which was not tight, and thus the leakage and contamination affected both the starboard and port sections.

Respondent contends: (1) The vessel was seaworthy on leaving Manila. (2) If the vessel was not seaworthy, the certificate of Morton and Ericksen is conclusive evidence that due diligence was exercised. (3) Whether the certificate of Morton and Ericksen was conclusive or not, the burden is on libelants to prove that due diligence was not exercised, and the evidence demonstrates that there was in fact all due diligence. (4) There was no negligence in the care and custody of the cargo. (5) There was no deviation. (6) In any event, there should be no allowance for contamination. (7) In any event, there should be no allowance for contamination of the coconut oil in the port deep tank. (8) If libelants are awarded damages, respondent is entitled to have deducted the amount of insurance paid or advanced.

I will consider respondent's contentions in their order. To have been seaworthy on leaving the port of Manila, the vessel must have been reasonably fit to carry the cargo in question. The Southwark, 191 U. S. 1, 15, 24 S. Ct. 1, 48 L. Ed. 65.

This she was not, because it is apparent that the hole in the top of the bottom tank had not been closed with a rivet, and, if it was closed with a wooden plug, of which there is no evidence, that would not have made the ship seaworthy, as it could well have been anticipated that such a plug would work out with the straining of the ship.

This is not a case of a leaking rivet, but of a hole in which there was no evidence that a rivet had ever been placed. The hole in question could not have been drilled after the cargo of oil had been placed in the deep tank. The Archer was not seaworthy on leaving Manila.

The following rider was attached to the bills of lading and became a part thereof:

"It is expressly agreed that if shipowner shall have exercised due diligence to make the vessel herein mentioned seaworthy and properly manned, equipped and supplied, carrier shall not be or be held liable for any loss of or damage to coconut or other vegetable oil

carried in bulk which shall be the result of contamination, discoloration, leakage, seepage, rust, effects due to carrying said oil in bulk, effects of steam coils and/or their connections, or the result of any other causes or circumstances of any nature, kind or character unless it be first proven that such loss or damage was caused by or resulted from carrier's neglect or fault or failure in proper loading, stowage, custody, care, or proper delivery of said oil. It is further expressly agreed that the report of Morton and Ericksen, the surveyors at the port of loading, that the vessel is in all respects seaworthy for the carriage of said oil and fit to receive and transport said oil and that the loading and stowage of said oil is proper shall be and be held to be conclusive proof as to shipper, consignee and/or owner or interested party that at the time of shipment and commencement of the voyage shipowner has exercised due diligence to make the vessel seaworthy in all respects for the carriage of said oil and fit to receive and transport the same, and that the loading and stowage of said oil was proper."

Section 2 of the Harter Act (46 USCA § 191) provides as follows: ·

"That it shall not be lawful for any vessel * * * her owner, master, agent, or manager, to insert in any bill of lading or shipping document any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence * * * to make said vessel seaworthy and capable of performing her intended voyage, * * * shall in any wise be lessened, weakened, or avoided."

This represents the limit beyond which the covenant and agreement cannot go to lessen, weaken, or avoid the obligation of the owner to exercise due diligence. The agreement in question attempts to indirectly exempt the owner from liability in a case where that result could not be accomplished directly. The Skipsea (C. C. A.) 9 F.(2d) 887.

■ The duty of the carrier to use due diligence is not satisfied by delegating that duty to a third person. International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 226, 21 S. Ct. 591, 45 L. Ed. 830; Bethlehem Shipbuilding Corporation v. Joseph Gutradt Co. (C. C. A.) 10 F.(2d) 769. Even in the case of a private carriage, where, as a result of the shipper's insistence that a deck cargo be carried, the vessel was overloaded, the master was responsible for the seaworthiness of the vessel. Olsen v. United States Shipping Co. (C. C. A.) 213 F. 18. I therefore find that, under the Harter Act, the certificate of Morton and Ericksen could not be made conclusive evidence that due diligence was exercised, but that the question of the exercise of due diligence is one of fact.

■ If, however, it be held that I am in error in that finding, it seems to me that the certificate does not satisfy the requirements of the bill of lading as to seaworthiness, and bills of lading are to be strictly construed against the carrier. The Caledonia, 157 U. S. 124, 137, 15 S. Ct. 537, 39 L. Ed. 644; Carib Prince, 170 U. S. 655, 660, 18 S. Ct. 753, 42 L. Ed. 1181.

■ Morton and Ericksen acted in at least three different capacities, viz. weighing and sampling oil, etc., for the shippers; supervising the preparation of the tanks for the liquid coconut oil for the shipowner; and as surveyors for the American Bureau of Shipping.

The special clause hereinbefore cited shows that it was agreed that the report of Morton and Ericksen, "that the vessel is in all respects seaworthy for the carriage of said oil and fit to receive and transport said oil and that the loading and stowage of said oil is proper," should be held to be conclusive proof that the owner had exercised due diligence to make the vessel seaworthy in all respects for the carriage of said oil. But there is no report of seaworthiness by Morton and Ericksen, as the only expression of opinion by them is found in the last paragraph of their certificate of October 26, 1923, which reads as follows:

"In the opinion of the undersigned, both sections of deep tank steamship Archer are now in fit condition to receive and carry coconut oil in bulk as cargo on the voyage intended without running undue risk."

The certificate of Morton and Ericksen is not conclusive evidence of the exercise of due diligence by the owner to make the vessel seaworthy.

■ The vessel was built for the government, by the government, and under government supervision, and has been continuously under the control of the government; yet no testimony was offered by the government to explain the existence of the hole, although its own witnesses admit that it was a drilled hole, not in any line of rivets, and did not connect the plate through which it went with any structure. The fact that the hole existed shows negligence.

The libelants are under no obligation to explain the existence of the hole, but it seems clear that work was done in the deep tanks after the examination by Morton and Ericksen, and that no proper examination and tests

were made after the completion of all the work and tests and before loading. Whether the hole was drilled during the tests, or in installing the additional heating coils, or even existed before the vessel entered the port of Manila, it was not properly closed, and this should have been discovered by a proper test.

As soon as the leak was discovered, the officers of the ship took all proper precautions to minimize the damage, and the loss in the instant case was not brought about by mistake in the management during the course of the voyage; therefore The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241, The Sandfield (C. C. A.) 92 F. 663, and U. S. v. N. Y. & O. Steamship Co. (C. C. A.) 216 F. 61, cited by respondent, are not in point.

It was the custom of the Barber Lines ships, going from Manila through the Suez Canal, to call at London and European ports not higher than Hamburg, and the libelant was charged with knowledge of this custom.

To make this custom binding, it does not seem to me that on each voyage call should have been made at the same ports, so long as call was made within the limits stated. My decision in General Hide & Skin Corporation v. U. S. (D. C.) 24 F.(2d) 736, 1928 A. M. C. 357, is not in point here, as that related to voyages between Tientsin and New York, and not between Manila and New York.

I am not concerned at this time with the amount of damages, which will be referred to a special commissioner, and I have already held that there was contamination of the coconut oil in the port deep tank.

The bills of lading contained the following provision:

"Also, that any carrier or party liable on account of loss or damage to any of said property shall have the full benefit of any insurance that may have been effected upon or on account of said property; and the carrier may deduct from any claim hereunder the amount of any loan made by any insurer on the goods carried hereunder, to the shipper or owner of the cargo, which loan is made pending any claim for insurance on such goods."

The insurance policy contained the usual clause stating that the insurance was to be null and void if the bill of lading contained any clause giving the carrier the benefit of insurance.

Certain sums were advanced to libelants as a loan under a receipt agreement. No direct payments were made under the policy.

The clause in question is invalid, and respondent is not entitled to have the amount of such loans deducted from the amount of its liability. The Turret Crown (C. C. A.) 297 F. 766.

A decree may be entered in favor of the libelants against the respondent, with costs and the usual order of reference.