## THE IOSSIFOGLU.

District Court, D. Maryland. May 29, 1929.
No. 1445.

Brown, Brune, Parker & Carey, of Baltimore, Md., and Haight, Smith, Griffin & Deming, of New York City, for plaintiff.

Janney, Ober, Slingluff & Williams, of Baltimore, Md., for defendant.

SOPER, District Judge. The Philippine National Bank is a Philippine corporation, having its principal office in Manila. It has a department called the Philippine Sugar Centrals Agency, through which it exports sugar from the Philippines, and also an agency in New York to attend to, and dispose of, the shipments. Usually the sugar is sent in cargo lots eastwardly through the Panama Canal to the east coast of the United States. In the year 1926 the bank handled 26 cargoes, and in previous years as many as 32 shipments.

On April 2, 1925, the owners of the British motor ship Iossifoglu chartered the vessel to the Philippine Sugar Centrals Agency to carry a full cargo of 7,500 tons of raw sugar from one or two ports in the Philippine Islands to two ports on the United States Atlantic Coast between Cape Hatteras and Boston, as ordered at the Delaware Breakwater. The ship was then discharging at Vladivostok. Sailing from that port on April 16 she arrived at Ilo Ilo on May 1, and thence proceeded under charterer's orders to Pulapandan, where she lay from May 3 to May 23, taking on her cargo. On the last mentioned date she sailed for Honolulu. In ordinary course she should have reached her ultimate destination and discharged her cargo not later than August 1, 1925. Such a voyage takes from 46 to 66 days. As a matter of fact, the Iossifoglu did not reach the port of Philadelphia (to which she was ordered as she neared the Delaware Breakwater), until September 14, and was not completely discharged until September 19. In other words, the voyage lasted twice as long as was to have been expected; and this extraordinary delay is the foundation of the libelant's case. It is claimed that the market price of sugar had fallen to such an extent by the time the vessel discharged her cargo that the bank suffered a loss of approximately $22,000, which would not have happened if the vessel had arrived on time.

The British corporation, Swan, Hunter & Wigham Richardson, Limited, claimant and owner of the ship, does not deny that the voyage took approximately 50 days longer than might reasonably have been expected, but nevertheless denies liability on two broad grounds: First, it says that under the facts of the case the ship is not liable for more than 27 days of the delay, and, since there was no drop in the market during this period, the libelant suffered no loss thereby; and, second, it contends that, even if the entire delay may be charged to the ship, still there is no liability, because there was no drop in the market price until after September 14, when the ship arrived in the port of Philadelphia. It is conceded that the market fell before the cargo was discharged, but it is contended that September 14 is the crucial date, because raw sugar is usually sold afloat, and must be sold before delivery to the refinery, if it is to be sold to the best advantage.

Considering, first, the causes of the ship's delay, it may be conceded, as the claimant contends, that the period of 50 days should

be divided into two intervals—one of 27 days, which occurred during deviation of the ship to Yokohoma, and her stay in that port after leaving Pulapandan; and the balance of the delay during the progress of the voyage between Yokohoma and Philadelphia. So far as the first delay of 27 days is concerned, it is not seriously disputed that the ship was to blame because she left Pulapandan with a foul bottom. There is a rapid growth of barnacles on the bottom of a ship in Philippine waters, especially when she is lying for a considerable period at the dock. It is customary in any event to dry-dock a steamship and paint it every 6 months to retard the growth of barnacles and keep the bottom free; but the Iossifoglu had not been painted since November 11, 1924. The result was that on May 28, 1925, five days after she left port for Honolulu, it was found that her speed was so retarded that she would not be able to reach Honolulu without refueling, and a deviation to Yokohoma became necessary. Additional time was lost by troubles with the machinery of the vessel, caused by the fouling of the water cooling jackets around the cylinders, which resulted in the overheating and fracture of the cylinder cover liners. Eight breakdowns at sea delayed the vessel a little less than 4 days on the leg of the voyage between Pulapandan and Yokohoma. She was detained in Yokohoma for the cleaning of the bottom and repairs to the machinery from June 10 to July 1. It was found that the bottom was covered with a coral growth to the thickness of three-fourths of an inch. Three cylinder cover liners were cast, machined, and fitted, and all piston water service tubes were renewed. All of the repairs were made and completed to the entire satisfaction of Lloyd's surveyor at Yokohoma.

After the ship left Yokohoma for Philadelphia via Honolulu, frequent stops were necessary because of defective machinery. Between July 1 and July 19, while the vessel was en route from Yokohoma to Honolulu, there were four stops at sea due to breakdowns in the machinery, which caused a delay of approximately 1½ days. It was also necessary for the vessel to stay in the port of Honolulu 4 days for repairs to the machinery. The cause of the breakdowns, according to the engineer, was the cracking of the piston rings of the engine. During the voyage from Honolulu to Panama between July 23 and August 25, there were seven stops at sea which caused a delay in the aggregate of approximately 7⅓ days. The cause of the trouble on these occasions was said to be

leaky piston water service tubes. In addition, the vessel was detained at Panama for repairs to the machinery for a period of 10 days. On the way from Panama to Philadelphia, between September 4 and September 14, there was a delay of a few hours at sea due to the breakdown of the engine. In all, the delays during the period between July 1 and September 14 amounted to approximately 23 days.

 It is contended on behalf of the ship that she has no responsibility for the delays during this second period because of a provision in the charter party that the ship should not be answerable for any loss or damage arising from any latent defect in the machinery not resulting from want of due diligence by her owners. It is pointed out that the machinery troubles, which arose between Yokohoma and Honolulu, and between Honolulu and Panama, were quite different from the defects occurring between Pulapandan and Yokohoma, which had some connection with the failure to cleanse the bottom of the ship before she left the Philippines; and it is contended that, since a certificate of complete seaworthiness was given by the surveyor after extensive repairs were made at Yokohoma, the subsequent defects must have sprung from latent causes not discoverable in the exercise of ordinary care. Hence the owner of the ship says that she is culpable only for the earlier delay, and, since no damages were suffered thereby, there can be no recovery at all, because the responsibility of a ship in the case of an involuntary deviation, caused by unseaworthiness at the beginning of the voyage, is limited to those injuries which flow from the lack of due care of the owner and does not extend to all injuries which would have been avoided if the deviation had not taken place. See The Malcolm Baxter, Jr., 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901.

But a careful consideration of the circumstances of this voyage and of the prior and subsequent history of the Iossifoglu compel the conclusion that the owners are not exempt from responsibility for the numerous breakdowns of the vessel's machinery after she left Yokohoma. A vessel is not excusable under such a charter party for a latent defect which existed at the beginning of the voyage. The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644. Despite the surveyor's certificate, one cannot avoid the inference that there was some serious mechanical deficiency when the ship set out. The case is not unlike that of the S. S. Poleric, decided in Bank Line v. Porter (C. C. A.)

25 F.(2d) 843, in which Judge Northcott showed that the vessel was liable because, in the opinion of the court, a succession of machinery troubles, taken in connection with the history of the voyage, proved that there was some fundamental and serious fault with the vessel when she sailed.

The Iossifoglu is a motorship of 8,600 tons dead weight, 400 feet in length, and 56 feet beam. She is equipped with two-cycle Diesel engines. She was completed in May, 1924, and sold by the builders on June 14, 1924, to the Ionian Marine and Land Investment Company Limited, which mortgaged her to the builder. During the summer and fall of 1924, the vessel made a voyage from England to British Columbia via the Panama Canal, and, returning in November, was drydocked for the ordinary overhaul of the engine and hull. No repairs were required, but the bottom of the ship was scraped and painted. There was a voyage from England to the Black Sea in the winter of 1925, and from the Black Sea, via the Suez Canal, to Vladivostok in the early spring of 1925. During the voyage from Mira, Borneo, to Vladivostok between March 16 and March 26, 1925, there were five stops at sea due to engine troubles which aggregated approximately 2 days in all. From March 26 until April 7 the vessel was unloading at Vladivostok, and subsequently for a period of 10 days there was a general overhaul of the engines and repairs.

After the voyage at issue in the case at bar, the vessel was detained at Philadelphia between September 21 and October 3, owing to engine repairs, during part of which time she was awaiting spare tubes and loading orders. Her next voyage was from Philadelphia, which she left on October 3, to certain ports on the Gulf of Mexico. She was held at Beaumont, Tex., on October 19, 20, and 21 for repairs to her engines. She left New Orleans for London on November 1. There followed a voyage from London to Bordeaux and the Tyne, where she arrived on January 7, 1926. Between January and June, 1926, she was taken back to the works of the builder, where her engines were removed, taken into the shop, and reassembled, and certain alterations to certain working parts were made. On August 11, 1926, the mortgagor sold the vessel to Moorgate Investment & Agency Company Limited, a corporation owned by the builder, and was released from its mortgage obligations. The last-named company owned the ship at the time of the circumstances of this case.

It is significant that the same chief engineer was on the ship from the time she was built until the time when the depositions in this case were taken. He referred to himself as a guarantee engineer, representing the builder, but said that the usual period during which such an engineer remains on board a ship does not exceed 6 months. During part of the time, one of the draftsmen, who was also a patentee of certain part of the engine, was on board as a representative of the owner. The officers of the ship testified that her engineers were in no way responsible for the frequent breakdowns in the machinery, but that these were due rather to the inherent character of the engine. Whether or not this testimony may be taken to mean that the engines were defective, it is difficult to resist the conclusion that such was the case when the incidents of the voyage undertaken under the charter party for the libelant, as well as other events in the history of the ship, are considered. The court reaches the conclusion of fact that the ship was unseaworthy when she sailed from Yokohoma, and is responsible to the libelant for any damages caused by the long period of delay in transporting the cargo.

The measure of damages in a case of this sort is somewhat uncertain in England, but in the United States, as will appear from the comment of Judge Rose in U. S. v. Middleton (C. C. A.) 3 F.(2d) 393, adopting the statement of Carver in Carriage of Goods by Sea, § 726, the rule is that the damages for improper delay are measured by the difference between the market value at the time when the goods should have arrived and their market value on actual arrival. The claimant nevertheless contends that this rule is not applicable here because of the way in which the importation of raw sugar is conducted. It is the general practice to sell raw sugar afloat; indeed, raw sugar, imported for sale as such, must be sold before it is discharged from the ship upon the refiner's wharf, for afterwards it is removed from the competitive market and can be sold only to the refiner. The claimant argues that if goods may be sold afloat, the price which the shipper receives is not affected by tardy delivery. If they are not sold before the arrival of the ship, and a drop in the market and a loss ensues, the proximate cause is the shipper's desire to speculate and not the ship's delay. It is conceded that one who imports goods for purposes other than sale, for instance, for storage or manufacture, may recover damages for negligent delay, and that the damages in such a case are usually calculated upon what the loss would have been

had the goods been sold; but nevertheless it is said that the measure of damages in the case of an article which can be sold before delivery should be limited, no matter what the shipper's purpose may be, to interest on his investment for the period during which he is deprived of the use of his goods.

The claimant furthermore contends that, even if the damages in this case should be based upon the difference in the market, the price on the day of prompt delivery should be compared with the price prevailing when the ship arrived in port and not when the goods were discharged upon the pier, because, as pointed out, there is no market for raw sugar already delivered to the refiner.

The significance of this contention becomes clear when the fluctuations in the market price during the period covered by the voyage of the Iossifoglu are considered. If there had been no extraordinary delay, she would not have delivered her cargo earlier than July 20 or later than August 3. During this period raw sugar was worth 4.27 cents per pound. Between August 3 and September 14, the price was never less, and usually more, than 4.27 cents per pound, but during the week after September 14, while the cargo was being discharged, the market fell. The prices current and the amount of cargo discharged from day to day are shown by the following table:

| Date. | Market Price. | Amount in Pounds of Cargo Discharged. |
|---|---|---|
| September 14 | 4.27¢ | |
| September 15 | 4.21¢ | |
| September 16 | 4.21¢ | 2,472,687 |
| September 17 | 4.21¢ | 5,350,455 |
| September 18 | 4.18¢ | 5,437,826 |
| September 19 | No market | 5,067,246 |
| September 20 | No market | |
| September 21 | 4.15¢ | |
| | | 18,328,214 |

The vessel arrived in the port of Philadelphia on September 14. She was towed to her berth at the refinery on September 15, and was discharged during the four succeeding days. There is nothing in the testimony to indicate that there was negligent delay in not providing a berth for the ship before September 15 or unloading her before September 16. The New York Sugar Exchange was closed, in accordance with the custom, on Saturday, September 19, and Sunday, September 20, so that there was no trade in sugar on those days. Hence the market price on the following Monday, September 21, is relevant. From these disclosures it is obvious that, if September 14 may be taken as the day of actual delivery, the libelant suffered no loss from the decline in market. The damages would be limited to the deprivation of the use of the goods during the period of delay which might be measured by interest on the amount invested in the goods or, at most, by interest upon the value of the goods at the time when they should have been delivered.

These arguments, however, are not well founded. The circumstance that merchandise transported by sea may be, or usually is, sold afloat, furnishes no substantial reason to deprive the shipper of the right to damages caused by a falling market during a period of negligent delay. That circumstance was indeed the basis of the earlier English rule announced in the case of The Parana, L. R. 2 P. D. 118. The court concluded that, when goods are saleable before delivery, damages from delay are not within the contemplation of the parties, and therefore may not be recovered. But the authority of this case was much shaken by the later case of Dunn v. Bucknell Bros., 2 K. B. 614, in which it was held that, whenever the circumstances admit of calculation as to the time of arrival of a ship and the probable fluctuations of the market, there can be no reason why damages for late delivery should not be calculated according to the same principle in the case of sea as of land transit. Indeed, it is obvious when these circumstances exist that the sale of goods at sea does not solve the problem; it is merely transferred from the seller to the purchaser. The holder of the bill of lading suffers the same damages, and should be entitled to the same right of recovery as the original shipper. See Israel & Bros. v. U. S. Shipping Board (C. C. A.) 23 F.(2d) 786. It is true that in The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644, and U. S. v. Middleton (C. C. A.) 3 F.(2d) 384 (certiorari denied, 267 U. S. 603, 45 S. Ct. 463, 69 L. Ed. 809), the leading authorities for the American rule, the courts were dealing with the shipment of goods not to be sold until after delivery, but in reason the rule should not be confined to such cases, and has not been so confined, as the following decisions show: Cohn v. U. S. Shipping Board (C. C. A.) 20 F.(2d) 56; U. S. Shipping Board v. Florida G. & E. Co. (C. C. A.) 20 F.(2d) 583; Israel & Bros. v. U. S. Shipping Board (C. C. A.) 23 F.(2d) 786; General Hide & Skin Corporation v. U. S. (D. C.) 24 F.(2d) 736.

It is quite clear that the shipment of sugar by the Philippine National Bank on the Iossifoglu comes within the scope of the rule.

The duration of the voyage from the Philippines may be calculated with some approach to certainty. The sugar trade is highly organized, and daily quotations of sales and prices upon the New York Sugar Exchange are carefully tabulated and studied and form the basis of the calculations of merchants. It was obvious to every one concerned that the bank was importing the goods as a dealer for commercial purposes. As a matter of fact, the goods were brought in to be refined and then sold for the bank's account. The refiner's statement of the proceeds was furnished on November 15, 1925. The price of refined sugar after September 21 was lower than it had been during the period when the sugar would have been refined and sold had it arrived on time. The libelant, however, properly claims only the loss on the raw sugar; and the circumstances recited are relevant only as illustrating the fitness of a rule which takes into consideration the fluctuations of the market in a transaction of this sort.

Nor is it proper, in determining whether the bank suffered damages for the ship's delay, to substitute September 14, the date of the arrival of the sugar in the port of Philadelphia, in place of the later dates upon which the sugar was discharged upon the wharf. The ordinary rule is that a ship has not performed her obligation to deliver the cargo until it has been placed upon the wharf; and there is no good reason why that rule should not be applied in this case. The claimant's argument is based upon the fact that raw sugar cannot be sold as such after it is delivered to the refiner, and claimant assumes that the rule for the measure of damages in case of delay rests upon the theory that the goods are to be sold immediately upon arrival. But this is not correct; "the foundation of the rule is that the consignee is entitled to the actual value of the goods at the time agreed upon for delivery. This is what he is deprived of by the breach of contract. There is nothing speculative in this as a measure of damage and he is equally entitled to it whether he keeps, sells, gives away or destroys the goods. Nor can it make any difference whether the transportation is by land or sea." 3 Sedgwick on Damages (9th Ed.) pp. 1769, 1770. The market price is merely the means by which the value of the goods is determined. So understood, it is clear that the rule protects not only the importer, who ships raw sugar for immediate sale, but also him who ships it for storage or for refinement and subsequent sale. It is not material that the libelant's sugar in the case at bar would not bring the market price, after it had been placed upon the wharf between September 16 and September 19. The recoverable damages contemplated by the parties to the contract in a shipment of this kind are fixed by the market price under normal conditions and not by the special purposes to which the goods may be applied by the owner.

The claimant and owner of the ship challenges the correctness of the prices furnished by the libelant's expert which have been set out in the aforegoing table. The ground of objection is that the prices for the period, September 16 to September 21, were based on sales of goods to be delivered not less than a week or ten days after the sales were made. There was a sale on September 14 of Philippine sugar due to arrive in the next few days, but no reported sale of goods between September 16 and 21, to be delivered within that interval. Hence it is contended there is no evidence to support the conclusion that the libelant's sugar, when delivered on the wharf, was worth the prices tabulated, and that the libelant failed to show that the market price of the sugar, when actually delivered, was less than the price on August 1. The claimant produced no witnesses to support this theory, and the weight of the evidence is against it. While the price of raw sugar varied from day to day during the period, it was not affected by the precise day of delivery. For instance, on September 14, sugar due to arrive in the next few days sold for the same price as goods to arrive in late September, and on September 18 goods which might be expected to arrive in two months brought the same price as goods which would be delivered in two weeks. It is most probable that, if the libelant's goods had been sold afloat, but ready for immediate discharge during the period between September 16 and September 21, they would have brought the same price as those actually sold within this period for delivery within the next two weeks.

The libelant estimates its damages at .12 cents per pound, the difference between 4.27 cents, the market price on or about August 1, and 4.15 cents, the price prevailing on September 21, the first market date after the cargo was completely discharged on Saturday, September 19. But there was no provision in the shipping documents, as is sometimes the case [see U. S. Shipping Board v. Florida G. & E. Co. (C. C. A.) 20 F.(2d) 583, 584], that the damages should be calculated with regard to the market price on the last day of landing cargo; and no good reason appears why the daily market price should not be applied to each day's delivery.

Since the market varied from day to day, the damages flowing from the decline in the market should therefore be calculated as follows:

| Date. | Market Price. | Decline in Market as Compared with Market Price on August 1. | Amount of Sugar Delivered. | Damages. |
|---|---|---|---|---|
| Sept. 16 | 4.21¢ | .06 | 2,472,687 | $ 1,483.61 |
| Sept. 17 | 4.21¢ | .06 | 5,350,455 | 3,210.27 |
| Sept. 18 | 4.18¢ | .09 | 5,437,826 | 4,894.04 |
| Sept. 19-21 | 4.15¢ | .12 | 5,067,246 | 6,080.70 |
| | | | 18,328,214 | $15,668.62 |

■ There remains the question whether compensation should be allowed to the bank for the detention of the goods during the period of delay. Under the authority of U. S. v. Middleton, supra, the libelant is entitled to such damages calculated by ascertaining the interest on the value of the sugar at the time when it should have been delivered, for the period of 50 days during which the delivery was improperly delayed.[1] The claimant points out that in U. S. v. Middleton, there was a complete failure to deliver the goods, whereas in the case at bar delivery was merely delayed; but the principle is the same in either contingency. The shipper is not fully compensated in the case of total failure to deliver until he is paid interest on the value of the goods from the time they should have been delivered until the day when settlement is made. Similarly the shipper of goods delivered after a period of unreasonable delay is not fully compensated for his loss, unless he has paid damages for the period between the date of proper delivery and the date of actual delivery. The authorities upon this subject are not in harmony, but U. S. v. Middleton, supra, settles the rule for this circuit. In Missouri, K. & T. R. v. Truskett, 104 F. 728, affirmed upon the opinion of the

[1] The total amount of sugar delivered was 18,328,-214 pounds, which at 4.27 cents per pound, the prevailing price on or about August 1, gives an aggregate value of $782,614.74. 50 days' interest on this sum is $6,432.48, and this is the amount which the libelant claims as compensation for this item of damages. This calculation, however, is based upon the gross value of the sugar delivered in Philadelphia, and leaves out of account freight, commissions, and other expenses which the shipper is obliged to pay. In arriving at damages for the deprivation of the use of the property during the period of delay, interest should be calculated on the net value of the sugar to the owner after the payment of the expenses thereon. The evidence does not indicate what this figure should be, and before the decree is presented there should be a stipulation of counsel or further depositions.

Circuit Court of Appeals by the Supreme Court in 186 U. S. 480, 22 S. Ct. 943, 46 L. Ed. 1259, interest was allowed for the period of negligent delay in the delivery of goods from the time the claim was made, which was as far as it was necessary to go in that case to sustain the charge of the trial court. See, also, U. S. Shipping Board v. Florida G. & E. Co. (C. C. A.) 20 F.(2d) 583; Southern Pacific Co. v. Arnett (C. C. A.) 126 F. 75, 80; The Styria (C. C. A.) 101 F. 728, 735; Houston & T. C. Ry. Co. v. M. L. Jackson, 62 Tex. 209; Miller v. Robertson, 266 U. S. 243, 257, 45 S. Ct. 73 (69 L. Ed. 265); 28 L. R. A. (N. S.) 20 (note V, d); 10 Corpus Juris, 309, § 445; 314, § 453; Hoogendorn v. Daniel (C. C. A.) 202 F. 431; Cincinnati & C. Traction Co. v. American Bridge Co. (C. C. A.) 202 F. 184.

■ The libelant also claims interest from September 19, 1925, on the aggregate sum composed of the damages consequent upon the decline in the market and the damages for the deprivation of the use of the property during the period of delay. The original libel was filed on August 18, 1926, and set out that there was a fall in the market price between July 27, 1925, and September 14, 1925, and that, because of unreasonable delay in the voyage, the libelant had been damaged to the extent of $20,000, and claimed that sum with interest from September 14. As we have seen, there was no decline in the market between the dates mentioned. An amended libel, however, was filed on January 27, 1927, in which it was alleged that the period of delay extended from August 1, 1925, to September 19, 1925. Damages to the extent of $22,000 for the unreasonable delay were claimed with interest thereon from September 19, 1925. The answer to the amended libel denied all the material claims for damages of the libelant. Under these circumstances, it is the opinion of the court that interest at 6 per cent. upon the aggregate damages, to be ascertained in accordance with this opinion, should be allowed only from the date when the amended libel was served. The decree in this case should therefore include: (1) Damages in the sum of $15,668.62, covering the decline in the market price of the libelant's goods; (2) damages for the detention of the goods during the period of delay, to be calculated in accordance with this opinion; and (3) interest as aforesaid upon the sum total of these items.