44 F.Supp. 915 (1942)
THE ZAREMBO.
AMERICAN-WEST AFRICAN LINE, Inc.,
v.
BALFOUR, GUTHRIE & CO., Limited, et al.
Nos. 16117, 16231.
District Court, E. D. New York.
March 16, 1942.
*916 Bigham, Englar, Jones & Houston, of New York City (James N. Senecal, Martin Detels, and Daniel A. Sullivan, all of New York City, of counsel), for Balfour, Guthrie & Co., Ltd., and Commonwealth African, Ltd.
Hunt, Hill & Betts, of New York City (George Whitefield Betts, Jr., Frank J. Zito and Helen Tuohy, all of New York City, of counsel), for American-West African Line, Inc.
CAMPBELL, District Judge.
The first above entitled suit was brought by libellants, Balfour, Guthrie & Co., Ltd., and Commonwealth African, Ltd., against the Steamship Zarembo, to recover for alleged damage by sea-water and sweat to bags of cocoa beans shipped from West African ports to the port of New York.
The second above entitled suit is brought on a cross-libel by the claimant, American-West African Line, Inc., against Balfour, Guthrie & Co., Ltd., and Commonwealth African, Ltd., to recover for general average expenses incurred in connection with the voyage.
By consent the two suits on libel and cross-libel were tried together before me, and as both suits arise out of the same voyage, one opinion for both cases will suffice.
As my findings of fact and conclusions of law in each case accompany this opinion, it will be necessary only to refer in a broad way to some of the facts on which my conclusions are based.
The important questions presented upon the trial of these suits are whether the Zarembo was seaworthy or whether the owner had used due diligence to make her seaworthy at the commencement of the voyage, and whether the vessel was relieved and exempted from liability by the provisions of the bills of ladings relating to perils of the sea and whether the cross-respondents were severally liable for expenses in general average.
The damage from sea-water is alleged to have been caused by two cracks in what is described as the G-2 plate, which is the No. 2 plate, numbering aft from the bow, in the G strake, numbering up from the keel.
The Zarembo is a three island ship of the type known as the Isherwood, 396 feet in length overall, 53.02 feet beam the depth of the lower hold being 18 feet and the tween decks 9 feet.
The Isherwood type of Steamship is little, if any, more subject to damage from panting than the transverse type.
*917 The Zarembo was built in 1919, and was well built, and was so constructed that beams and plates, including the G-2 plate on the inside of the vessel, could be easily inspected from the inside when afloat, but the inspection of the outside of the plate could be made only when the vessel was on dry dock, or the vessel was light enough for the plate to be out of the water.
A large amount of testimony was given by surveyors, mariners and metallurgical experts with reference to the cause of the cracking of the G-2 plate, which need not be specifically recited here, and I am convinced that it was not due to metal fatigue, as contended by claimant, but was due to corrosion and grooving of the G-2 plate, which because of its thinness, grooved and cracked under the unusually violent winds and waves, between December 29th, 1939, and January 9th, 1940. The plate in question, when measured, after it had been removed on the return of the vessel to New York, showed more than a reduction in thickness of twenty-five percent, which is the limit usually accepted as the maximum. I, therefore, am convinced that as to the No. 1 hold the vessel was unseaworthy before and at the beginning of the voyage.
Under the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303, the carrier is bound before and at the beginning of the voyage to exercise due diligence to make the ship seaworthy, and by Section 1304(1) of that Act, whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier, or other persons claiming exemption under that Section.
The duty of the carrier to use due diligence is not satisfied by delegating that duty to a third person. Philippine Refining Corporation et al. v. United States, D.C., 29 F.2d 134; Id., D.C., 33 F.2d 974, affirmed 2 Cir., 41 F.2d 1010.
The obligation of the ship owner to use due diligence to make the vessel seaworthy under the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., is the same as under the Harter Act, 46 U.S.C.A. §§ 190 et seq., and the Supreme Court in International Navigation Co. v. Farr & Bailey Manufacturing Co., 181 U.S. 218, at page 226, 21 S.Ct. 591, at page 594, 45 L.Ed. 830, said: "The obligation was to use due diligence to make her seaworthy before she started on her voyage, and the law recognizes no distinction founded on the character of the servants employed to accomplish that result."
The Zarembo was examined annually and whenever she was on dry dock in this country, by the surveyors of the American Bureau of Shipping and the United States Inspectors of the Department of Commerce, who were accompanied by officers of the ship, and in some instances by the Port Engineer, and Marine Superintendent of the claimant, and she was also given a special examination every four years. An annual examination was made in January, 1939, and a four years' examination was made in November, 1939, just before the Zarembo sailed on the voyage in question. The examination of the plates of the ship was made in the usual manner, which is accepted generally as good practice, that is, the examiner would visually examine the plates to see if there was anything wrong, or suspicious with any plate, such as corrosion, grooving, or other causes, and if there was, by the use of a hammer, determine if further investigation was necessary, and if so, to drill a hole in the plate for a final determination. The following men participated in such examinations, and none of them found any groove, or other than a little corrosion in the G-2 plate: Mr. Gledhill, the port engineer of the American-West African Line, Inc., a man of long experience as an engineer at sea in the corrosion of ships, and for a short time surveying, said that at the annual survey in January 1939, he made an examination of the exterior of the ship, including the G-2 plate, the second or third time after the ship was cleaned and scraped, at which time he was accompanied by Mr. Mackenzie and a yard man, most of whose function was to record what they instructed him to take care of. He also said that at Robin's Dry Dock in November, 1939, he examined externally the plates, including the G-2 plate in question, after they had been scraped, wire brushed and hosed, and did not find any undue corrosion, or groove, and that at that time there was present with him an American Bureau Surveyor, a local United States Inspector, and Captain Sparrow, the American-West African Line's Marine Superintendent.
Captain Sparrow, the Marine Superintendent, of the American-West African Lines, a man of long experience as a *918 Master of ships, engaged in the West African trade at the ports in question, was stationed at one of them, the port of Lagos, for five years, was general agent representing steamship owners, and the United States Shipping Board. He said that he participated in the January, 1939, survey, with Mr. Mackenzie, the American Bureau of Shipping Surveyor, and the United States Government Inspector, Mr. Gledhill and a man from the yard were present, and that at that time the sides of the vessel had been cleaned off to the extent of wire brushing, scraping, and prepared to receive paint, and that he did not find any grooves or depressions in the plates on the starboard side forward, including the G-2 plate in question, nor any evidence of any cracking or excessive corrosion. He supervised and ordered the cleaning of the ship for the November, 1939, examination. He did not examine the interior of the plates, but did examine the exterior of the plates, including the G-2 plate in question, with the same persons as those named by Mr. Gledhill after it was cleaned off and found no evidence of undue corrosion, or grooves in the plates.
Mr. Watkinson, an experienced man, and a United States Steamboat Inspector of the Department of Commerce, who had acted as such for about 35 years, the holder of a Master's license for inland waters, and prior to that time had serviced aboard vessels, and held his position as a result of an appointment after passing an examination. He is also referred to as a Local Inspector, and had acted as such at New York, Providence and Buffalo. He said that his duty was to make an examination of vessels and their equipment, and report as to the conditions found, and if satisfied, a certificate issued once a year. He further said that he examined the interior of the Zarembo while in the water, and the exterior while in dry dock, in January, 1939, and found it good, and that he did not find any corrosion. He also said Mr. Mackenzie of the American Bureau, Mr. Gledhill, Mr. Sparrow and the Chief Officer of the vessel were with him.
Mr. Narter  a man of experience as a marine surveyor with the American Bureau of Shipping, from April, 1938; he sailed as a marine engineer on Standard Oil Company tankers from 1933 to 1938, and prior to that was junior electrical engineer with the Consolidated Edison Company for about two and one-quarter years. He is the holder of a license as first assistant engineer. He attended on the usual four year survey, in November, 1939, which he says was a more thorough survey than the annual surveys. He also said that he examined the inside of hold No. 1, and found no corrosion, or grooving, although the inside of hold No. 1 was clean and the plating was freshly painted.
Mr. Atwood, who had twenty-four years' experience at sea as an officer, had a Master's papers, and was Chief Officer of the Zarembo, accompanied Captain Kelley, the United States Inspector Department of Commerce, when he made the November, 1939, survey of both the interior and exterior of No. 1 hold, and says that he did not find any excessive corrosion, or any groove, dents, bumps or depressions in the G-2 plate, and also examined the interior of hold No. 1 at sea with a scraper, with the same result. Mr. Atwood was not in the employ of the claimant when he testified, but was an officer in the Naval service of the United States.
Mr. Hodges, the Fourth Officer of the Zarembo in 1939, says that while the Zarembo was on dry dock in November, 1939, he went under the bottom of the ship, and looked at the plates, including the G-2 plate, and did not see any grooves or depressions in it.
Mr. Hammond, a man with experience as an officer since 1931, the holder of a Chief Officer's certificate and Second Officer of the Zarembo, acting as Chief Officer, on the voyage before that, says that he was on the January, 1939, survey with Mr. Mackenzie, the American Bureau surveyor, and Captain Watkinson, a Steamboat Inspector, and Mr. Gledhill and Captain Sparrow, and examined her plates, including said G-2 plate, and found a little corrosion, but no dents, depressions or grooves.
Captain Mace, Master of the Zarembo, an experienced man, holding a Master's license unlimited for 12 years, had been going to sea for about 25 years, and had an officer's license for about 12 years prior to the time he had received his Master's license, said that he joined at dry dock just before the vessel sailed for West Africa in November, 1939, in which trade he had sailed for 13 years. He said that with the first officer, Mr. Atwood, who had a scraper, and he the Captain had a knife, he examined the plates, including the G-2 *919 plate in question, from the inside during the voyage to West Africa, and found no grooves. At Apapa Wharf, Lagos, he says that he examined from the outside the forward starboard plates, which were above water, including the G-2 plate, and found no groove or corrosion.
Mr. Rice, a man with 36 to 37 years' experience at sea, Chief Engineer of the Zarembo, and the holder of a Chief Engineer's certificate for 28 or 29 years, says that he looked over the inside and outside of plates, including the G-2 plate, at Robins Dry Dock, after he joined on November 10th, 1939, and found no grooves, but did not use any hammer or scraper. On November 20th, 1939, while at sea on voyage to West Africa, with Mr. Atwood, Chief Officer, and Mr. Shockley, First Assistant Engineer, he examined the inside of hold 1, but did not make a detailed examination of the plates, but saw Mr. Atwood using a scraper on them.
Captain Andrew J. Kelley, a man of long experience, United States Government Inspector of steam vessels for 17 years, holder of Masters' and Pilots' licenses 29 years, other licenses 6 years, at sea 49 years, says that he examined the Zarembo inside and outside at Robins Dry Dock on November 10th, 1939, and did not see any grooves or depressions in the plates on the starboard side forward. This would include G-2 plate.
Mr. Mackenzie, an experienced surveyor 6 years with the American Bureau of Shipping, served apprenticeship in shipyard in Scotland for 5 years, after that worked there for 9 years, and then went to sea, and went through every grade to Chief Engineer, says that he did not see any corrosion, although the plates had been cleaned with scraper and brushes.
He also says that Captain Sparrow was present, but does not remember the others. He found plates F-1 on the port and starboard sides of the vessel commencing to show considerable wastage, and recommended that they be removed, but not until a subsequent date. The F-1 plates were forward of the collision bulkhead and No. 1 bulkhead would confine any leak to the fore peak tank.
Libellant makes a point of the finding of the wastage in plates F-1, and contends that by reason thereof a more careful examination of the plates, including the G-2 plate, should have been made, but it seems to me that the finding of these F-1 plates in the usual way shows that the examination was not merely perfunctory, but of a kind to develop defects.
From the foregoing it seems clear that inspections were carefully made in the usual and approved manner.
The mere fact that there may have been an unobservable defect in the G-2 plate, due to its having thinned more than 25% of its original thickness, does not entitle the libellants to recover, as it was to relieve a ship or its owner from such a situation, that the Harter Act and the Carriage of Goods by Sea Act were enacted, which give exemptions from such liability if due diligence was exercised to make the vessel seaworthy.
Of course the duty to exercise due diligence cannot be delegated, nor is there any attempt to do that here, but it is difficult to understand how the ship, or her owner could have been more diligent. It would be difficult to suggest more competent persons to make such inspections than the surveyors of the American Bureau of Shipping, the United States Government Inspectors of the Department of Commerce, the Port Engineer and Marine Superintendent of the claimant, and the officers of the ship itself, all of whom, without exception, say that they saw no excessive corrosion or groove, in the G-2 plate, and of course the thinness of the plate could only have been found by drilling, which certainly could not have been required, unless something appeared to the eyes which required it.
It should be further considered that the United States Government Inspectors are clearly disinterested witnesses.
The Zarembo left New York, light, on November 11th, 1939, for West African ports. She loaded cocoa beans at two ports, Lagos and Accra, and then loaded at Grand Bassain logs on deck forward and aft, and some on the hatches, and sailed for New York on December 20th, 1939. Not only were cocoa beans loaded in the holds 1, 2, 4 and 5, and tween decks, but also in the deep tanks, which are known as No. 3 and at the time of loading the holds and deep tanks were clean and and dry and the usual precautions were taken to guard against sweat.
Structurally, the vessel provided properly for the drawing of water and sweat into the scuppers, and for ventilation, and insofar as all of the ship, except hold 1, was concerned, the owner had used due diligence *920 to make her seaworthy, and the vessel was seaworthy when she left New York, and when she left each of the ports in West Africa, and when bound for New York. There was no leakage and, except for such sweat as is normally found in leaving the warm water of West Africa, and coming into the colder water on the way to New York, no reason to anticipate sweat.
The sweat was not increased by the shipment of logs, some of which were placed over the hatches, as part of the hatches could be opened for ventilation.
The claim that No. 3 tanks were not proper places for stowage of beans is without merit, as they have sufficient ventilation, as is shown by the fact that cocoa beans have been carried about every other voyage in those tanks, and no more sweat has been found in them than in any other place on the ship, in fact, there was less moisture to be condensed in the deep tanks than in the holds or tween decks. None of the bags in the deep tanks No. 3 were damaged by salt water, the appearance of signs of salt found on the exterior of the bags, but not on the beans, was caused by spray before the bags were loaded on the vessel from small boats and lighters.
The carrier had used due diligence at and before the commencement of the voyage, and at and before leaving each of the West African ports to make the Zarembo seaworthy. The Emilia, D.C., 13 F.Supp. 7, 1936 A.M.C. 22; The Blommersdijk, 1936 A.M.C. 713; The Schoharie, 1937 A.M.C. 610; The Cameronia, D.C., 38 F.2d 522, 1930 A.M.C. 443; The Floridian, 2 Cir., 83 F.2d 949, 1936 A.M.C. 1006.
The vessel had encountered good weather on her voyage over to West Africa, and between the ports on that coast, and on her homeward voyage from December 20th, 1939, to December 29th, 1939, when she encountered, between that date and January 9th, 1940, with some periods of moderation of the wind, high winds and seas of a violence rarely encountered on any sea, during which the vessel pitched and labored heavily, shipped green seas, steamed at reduced speed, the engines at times raced, the vessel on several occasions hove to, and the wind went to force 10, as described by her Master and officers, particularly Mr. Atwood, the Chief Officer, which was corroborated by official weather reports, and the testimony of Andrew J. Ginder, Chief Officer of the Azalea City, whose ship was some distance from the Zarembo, but undoubtedly felt the effects of the same wind and seas.
On January 9th, 1940, the vessel was getting down by the head, and was almost unmanageable on the course she was trying to steer for New York and the weather reports being of bad weather ahead, the Master of the Zarembo went into Bermuda for repairs.
The effect of the winds and waves was to cause panting of the Zarembo, grooving, and the cracking of the G-2 plate, and the incoming of the salt water into hold No. 1, and damaging with salt water certain of the bags of beans therein, thus making manifest a latent defect in the G-2 plate, which, with the exercise of due diligence on the part of the ship and her owner, had not been ascertained. There can be no recovery by the libellants for such damage. The finding of beans in the rose boxes was not the result of any negligence on the part of the ship or her officers, but was probably caused by the breaking of a bag or bags, because of the swelling of the wet beans, and the beans by the excellent drainage system of the hold No. 1 were carried toward the scuppers.
The said violent winds and waves compelled the ship to keep her hatches closed, and its tarpaulin covers battened down, and the ventilators trimmed from the wind or covered, and prevented the necessary ventilation, which under normal conditions would have been received through the ventilators, and the opening of a part of the hatch covers in good weather, and caused the more than average amount of sweat suffered by some of the bags.
The wind and storm from which the Zarembo suffered was a peril of the sea. (Duche v. Thomas & John Brockle-bank) (The Makalla), 2 Cir., 40 F.2d 418, 1930 A.M.C. 717; Pillsbury Flour Mills Co. v. Becker S. S. Co. (The Francis L. Robbins), D.C., 49 F.2d 648, 1931 A.M.C. 1340; The Warren Adams, 2 Cir., 74 F. 413, 415.
The loss and damage claimed in the libel resulting from wetting of some of the bags of beans by salt water was caused by the act of God, perils, dangers and accidents of the sea within exception of the bills of lading, and the United States Carriage *921 of Goods by Sea Act; and the carrier having used due diligence to make the Zarembo seaworthy, and the holds and deep tanks, with the exception of hold No. 1 having been seaworthy and the vessel having been properly manned, equipped and supplied, and there having been no negligence on the part of the vessel, neither the vessel, her owner or agent is liable for such damage under the bills of lading for damages caused to the beans by sweat.
The libellant Commonwealth African, Ltd., did not give any written notice of loss or damage to the vessel's agent within thirty days after the removal of the goods from the custody of the ship or in case of failure to make delivery within 30 days after the goods should have been delivered, nor did it file any written claim for loss, damage, or delay, with the vessel's agent within six months after giving such written notice, all as required by the bill of lading, nor was there any joint survey or any note of damage made on the delivery book.
Inasmuch as I have concluded that the Commonwealth African, Ltd., could not recover for damages to the goods which it took from the custody of the ship for another reason, I will at this time particularly devote my attention to the 53 bags of beans as to which it claims short delivery, as to which no notice of loss or damage was given, or claim for loss or damage was filed, as aforesaid.
There is a clear distinction between notice of loss and damage, and a written claim for loss or damage. A. Russo & Co. v. United States et al., 5 Cir., 40 F.2d 39.
Unless libellant affirmatively shows that a written claim for loss or damage was filed as required by the bill of lading, it cannot recover. (The Schoharie), 1937 A.M.C. 610; The General G. W. Goethals, 2 Cir., 298 F. 935, 1924 A.M.C. 739; United States Ind. A. Co. v. Calmar S. S. Corp. (The Massmar), 2 Cir., 57 F.2d 182, 1932 A.M.C. 526; Bank of California, N. A. v. International Mercantile Marine Co. (The Mongolia-Manchuria), 2 Cir., 64 F.2d 97, 1933 A.M.C. 719; Anchor Line v. Jackson, 2 Cir., 9 F.2d 543.
I do not agree with libellant that by reason of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(6), which makes the removal of the goods without giving written notice of loss or damage prima facie evidence of good order delivery, a failure to file a claim for loss or damage does not constitute a defense to the carrier when a provision requiring the filing of claim is included in the bill of lading.
No case has been cited that supports that contention.
The provisions of the Carriage of Goods by Sea Act relates to notice of loss or damage, not to claim for loss or damage, and I see nothing in the Act which excuses the libellant from filing claim for loss or damage if the same be required by the bill of lading.
See "Model Ocean Bill of Lading" by Deutsch, published in 1940, where he says at page 223: "On the other hand, the statute makes no mention whatever as to claims, and there seems to be no logical reason why a carrier may not still require the filing of a claim as a condition precedent to bringing action. If it be suggested that the statute permits the bringing of action in any event within one year after delivery of the goods, the obvious answer seems to lie in the fact that the statute merely states that the carrier shall be relieved of any liability unless the action is brought within one year. There is no provision in the Act prohibiting any other conditions which might have the indirect effect of shortening the time so limited."
In forming my opinion in these cases I have considered only the bills of lading and the Carriage of Goods by Sea Act, Title 46, U.S.C. § 1300 et seq., and have excluded from consideration the so-called British Ordinances, because of the following provisions of that Act; Section 1300 of which provides as follows: "Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this chapter and section 25 of Title 49."
Therefore the Carriage of Goods by Sea Act applied to the shipments in question, and the effect of the so-called British Ordinances is to increase the immunities of the carrier, which is not permissible under the Act as under Section 1305 of the Act the carrier could only be at liberty "to surrender in whole or in part all or any of his rights and immunities or to increase any of his responsibilities and liabilities under this chapter * * * provided *922 such surrender or increase shall be embodied in the bill of lading issued to the shipper."
This is quite different from requiring the filing of a claim for loss or damage which makes no change in the rights and immunities of the carrier.
As to the second above entitled suit, cross-respondents contend that American-West African Line, Inc., cross-libellant, has not offered sufficient evidence to sustain its libel, as the general average agreements were not offered in evidence, and the general average statement was objected to and excluded, and that no further proof concerning it was brought forth.
The contention of the cross-respondents is not sustained.
The bills of lading provide "General Average shall be adjusted and settled in New York and shall be payable according to the York-Antwerp Rules 1924, 1 to 15 inclusive and Rules 17-22 inclusive, and as to matters not provided for according to the Laws and usages of the Port of New York." The evidence offered on the trial shows that the Zarembo and her owner had used due diligence to make her seaworthy before the commencement of the voyage in question, and that she was properly manned, equipped and supplied. That by reason of the damages received by reason of the high winds and waves, the incoming of water, the enormous seas sweeping over the vessel, rendering steering difficult, and because of danger to life and property, the Master of the Zarembo, after consultation with his officers, put into Bermuda, as a port of refuge for repairs, which were made, for which, and other necessary purposes, expenses were incurred at Bermuda and New York. That thereafter the Zarembo proceeded on her course to New York, where she discharged her cargo.
It is true that the cross-libellant did not offer in evidence the general average agreements and, therefore, the Court could not say that in said agreements there was a provision naming by whom the general average was to be determined, or that such determination was to be binding, therefore, the Court could not receive in evidence the general average statement, but the making of the general average agreements, by cross-respondents, was alleged in the cross-libel, in the twelfth paragraph thereof, and in their answer cross-respondents admitted that in order to obtain delivery of their merchandise cross-respondents had to sign certain papers for the terms of which it refers to original thereof when produced.
It, therefore, seems to me that the cross-libellant has shown a right to recover in general average, but this Court can not determine the amount, but must send it to a Commissioner.